# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-4140

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KENNETH A. LEE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 CR 10096—**Michael M. Mihm**, *Judge.*

_____

ARGUED FEBRUARY 24, 2005—DECIDED JUNE 28, 2005

_____

Before FLAUM, *Chief Judge*, and MANION and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Police executed a search warrant on a residence in Peoria, Illinois on July 3, 2002, looking for drugs and associated paraphernalia. In the residence, the police found Kenneth Lee seated at a kitchen table, with crack cocaine on and underneath the table. After delivering *Miranda* warnings, the police interrogated Lee in the bathroom and he admitted that the crack was his. On August 21, 2002, Lee was indicted in the United States District Court for the Central District of Illinois for possession of more than

five grams of a mixture and substance containing cocaine base (crack) with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). A jury convicted Lee on August 7, 2003, and he was sentenced to 262 months' imprisonment. Lee appeals, claiming that the police violated his *Miranda* rights by interrogating him after he invoked his right to counsel. Lee also challenges his sentence based on *United States v. Booker*, 125 S.Ct. 738 (2005). We affirm Lee's conviction but order a limited remand to the district court for sentencing determinations pursuant to *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I

The Peoria Police Department obtained a search warrant for 1617 W. Lincoln Ave. in Peoria based on information from a confidential informant, who made several drug buys from Kenneth Lee at that residence. The police approached the front door of the residence and knocked. When asked by a voice inside who was at the door, a police officer responded "Toby" (the name of the drug-sniffing dog accompanying the officers). When the door opened slightly, the police forced the door open completely, identified themselves as police, and stated that they had a search warrant.

Proceeding into the apartment, the police found Lee seated at a table in the kitchen. On the kitchen table, the police saw crack cocaine packaged in plastic bags, as well as a number of unpackaged rocks of crack cocaine. On the floor beneath where Lee was sitting, there was more crack cocaine. On top of a dryer within arm's reach of where Lee was sitting, the police found several additional plastic bags containing crack cocaine. Lee's state identification card was also on the table, as was a razor blade. Not realizing that Lee suffered from a neurological impairment that impeded

his motor coordination,[1] the police asked Lee to get on the floor. Lee collapsed onto the floor.

Officers Marion and Moore took Lee into a nearby bathroom where they explained the search warrant to him. Before the officers began questioning him, Lee blurted out, "She didn't know anything about it. Don't take the kids." Including Lee, there were three adults and five children in the residence at the time of the search. Lee apparently was referring to his caretaker, Carol Faulkner, and the caretaker's children. Officer Marion then read Lee the *Miranda* warnings and asked if Lee understood them, to which Lee responded in the affirmative.

Continuing, Officer Marion inquired regarding Lee's willingness to talk to them. Lee answered, "Can I have a lawyer?"[2] At this point, Officer Marion told Lee that he would not question him about the incident if a lawyer were present. Officer Moore informed Lee that a lawyer would tell him not to say anything. Further, Officer Moore said that Lee could help himself by talking, and that if he wanted to take responsibility, he should talk to Officer Marion. Lee responded that he did want to help himself out and talk.

After Lee made this statement, Officer Marion confirmed that Lee wished to talk to the officers. Lee detailed that he purchased a half of an ounce of crack prior to the search and that he was in the process of preparing it for sale. Lee also told the officers that he had been selling crack out of his residence for approximately three months.

---

[1]  Lee suffers from Charcot-Marie Tooth syndrome, a neurological impairment affecting his extremities.

[2]  While the parties' briefs on the motion to suppress in the lower court offered slightly different formulations of Lee's question, the district court found that Lee formulated the question as above.

Before the district court, Lee, representing himself, moved to suppress the confession, arguing that the police violated his *Miranda* rights when they continued talking to him after he asked about the lawyer. The court made a factual finding that Lee asked, "Can I have a lawyer?" The court analyzed this statement under *United States v. Wesela*, 223 F.3d 656 (7th Cir. 2000), and decided, in light of that case, that Lee failed to make a clear and unambiguous invocation of his *Miranda* rights. Accordingly, the court denied Lee's motion to suppress.

After a trial, a jury convicted Lee. At sentencing, the court found that Lee had a total offense level of thirty-four based on a career criminal provision in the Sentencing Guidelines. The court found that Lee's relevant conduct also would result in a total offense level of thirty-four. This level, when combined with Lee's criminal history, produced a Guideline range of 262 to 327 months' imprisonment. The district court sentenced Lee to 262 months. Lee appeals.

## II

Before this court, Lee mounts two separate challenges. First, he argues that the district court improperly denied his motion to suppress. Specifically, Lee asserts that his question to the police officers was a clear invocation of his right to counsel and that his subsequent confession must be suppressed. Lee also argues that his sentence is improper because the Guidelines were considered mandatory at sentencing.

## A

"When reviewing appeals from denials of motions to suppress, we review legal questions de novo and factual

findings for clear error." *United States v. Fields*, 371 F.3d 910, 914 (7th Cir. 2004). The court's central factual determination in the hearing on the motion to suppress—that Lee asked the officers "Can I have a lawyer?"—is unchallenged by either party before this court, and we accept it for purposes of our review.

Lee contends that this statement was sufficient, as a matter of law, to invoke his *Miranda* rights and the protections outlined by that case and its progeny. As even the casual television and movie viewer realizes, the police must inform an accused of various rights before beginning an interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* stands for the proposition that an accused subject to custodial interrogation must be informed of the right to consult with an attorney and to have that counsel present during questioning. *See Miranda*, 384 U.S. at 471-72; *see also Davis v. United States*, 512 U.S. 452, 457 (1994). If an accused invokes this right, he "is not subject to further interrogation until counsel has been made available to him, unless the accused himself initiates further communication." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also Miranda*, 384 U.S. at 474.

Since the police must stop questioning if an accused asserts his *Miranda* right to counsel, the crucial question in the present case becomes whether Lee clearly invoked this *Miranda* right. "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry." *Davis*, 512 U.S. at 458-59; *see also Lord v. Duckworth* 29 F.3d 1216, 1220 (7th Cir. 1994). If an accused makes a reference to an attorney that is ambiguous "in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our [the Supreme Court's] precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459.

The police are under no obligation to clarify an ambiguous statement by the accused. *See United States v. Muhammad*, 120 F.3d 688, 698 (7th Cir. 1997). Rather, the accused must make a clear and unambiguous assertion of his right to counsel to stop questioning, although there is no exact formula or magic words for an accused to invoke his right. *See Davis*, 512 U.S. at 459. If an accused confesses, but the police have violated the principles of *Miranda*, that statement cannot be used against the accused at trial. *See Edwards*, 451 U.S. at 485.

Here, the district court relied on the ruling of this court in *United States v. Wesela*, 223 F.3d 656, 661-62 (7th Cir. 2000), when it determined that Lee had not clearly asserted his rights. In that case, Wesela presented a challenge to two separate confessions based on *Miranda*. Police arrested Wesela after his wife reported that he had a gun, had threatened her, and had killed the family cat. *See id.* at 659. After the arrest, Wesela was read a *Miranda* warning, and he responded, "Could I get a lawyer?" *See id.* at 661. The police detective at that time explained that he could not call a lawyer for Wesela, to which Wesela answered: "I can't call one either. All right here's what happened." *See id.* We held that the police officer's statement was similar in content to another police statement, "where the police told the defendant that he had a right to a lawyer, but that they had no way of giving him one," which the Supreme Court upheld as proper. *See id.* at 662 (citing *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989)). Several days later, Wesela also volunteered incriminating information to a special agent who transported Wesela to the federal courthouse for his initial appearance, even though the special agent repeatedly asked Wesela not to talk about the facts of the case. *See Wesela*, 223 F.3d at 661-62. Again, this was found to be proper because Wesela had initiated the conversation. *See id.* at 662.

The government's reliance on *Wesela*, however, is misplaced because, in that case, this court did not expressly address whether Wesela's statement, "Could I get a lawyer?", was ambiguous. Rather, this court focused on the issue of whether Wesela had reinitiated the conversation in such a way that the police could continue questioning. *See id*. This treatment suggests that Wesela had, in fact, properly requested counsel and that the police could only interrogate if he voluntarily renewed the discussion. If that is the case, given that there is no real difference between Wesela's statement ("Could I get a lawyer?") and Lee's statement in this case ("Can I have a lawyer?"), it would likewise appear that Lee invoked his rights.

This conclusion, however, is only implicit in *Wesela*, because, as noted above, *Wesela* did not expressly address the initial question concerning whether the defendant had invoked his right to an attorney. We look to other cases for guidance, therefore. The government references several cases with convoluted and ambiguous references to lawyers that failed to qualify as a clear call for counsel. *See Lord*, 29 F.3d at 1220-21 (defendant's statement "I can't afford a lawyer but is there any way I can get one?" not an unambiguous request for a lawyer); *United States v. Walker*, 272 F.3d 407, 413-14 (7th Cir. 2001) (defendant's statement that "he wasn't sure whether he should talk to [the agent] because he was afraid it would piss his lawyer off" not an unambiguous request); *United States v. Buckley*, 4 F.3d 552, 558-59 (7th Cir. 1993) (defendant's statement "I don't know if I need an attorney" not an unambiguous request). Each of the statements "lacked the clear implication of a present desire to consult with counsel." *Lord*, 29 F.3d at 1221. That was also the case in *Davis*, where the Supreme Court decided that "maybe I should talk to a lawyer" merely indicated a potential desire to consult with legal counsel, not a clear

request for counsel. *Davis*, 512 U.S. at 462. "Unless the suspect actually requests an attorney, questioning may continue." *Id.*

In the *Lord* decision, however, this court mentioned several requests for counsel that it considered unequivocal: "I think I should call my lawyer"; "I have to get me a good lawyer, man. Can I make a phone call?"; "Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?" *See Lord*, 29 F.3d at 1221 (quoting cases from Eleventh and Ninth Circuits regarding unambiguous invocation of right to counsel). Lee's statement—"Can I have a lawyer?"—was similar to these statements recognized by this court as proper invocations of the right to an attorney. Therefore, unless the police obtained further clarification from Lee that this was actually an unequivocal request for an attorney, they should have halted the interrogation.

Before proceeding with the analysis, we remind police officers of the instruction the Supreme Court offered in *Davis*: "[w]hen a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." 512 U.S. at 461. By affirmatively establishing whether a suspect invoked counsel, police (and reviewing courts) can know precisely where they stand. We highly encourage police to follow the advice offered by the Supreme Court and take the time to clarify such issues at the time of interrogation rather than in after-the-fact arguments before the courts.

In this case, the subsequent conduct of the police is a matter of some concern, though, ultimately, we do not ground our decision on this basis. After Lee's invocation

of his right to counsel, the police did not continue to interrogate him *per se*, which would be an obvious *Miranda* violation. However, the two police officers, who were in a bathroom with Lee at the time, immediately tried to persuade Lee to give up his asserted right to counsel. The police indicated that they would not talk to him (and ostensibly cut any deal) in the presence of a lawyer. The police dangled leniency in front of Lee, stating that if he wanted to help himself he would talk to them and not ask for the lawyer. The difficulty in this case lies in the uncertainty about whether these tactics crossed over into the type of coercion forbidden by *Miranda*. The police responded to Lee's invocation of rights not by further interrogation, but by explaining the potential effects of his decision. It is not clear whether these comments, apparently designed to persuade, run afoul of *Miranda*.

While we are concerned by the practices employed by the police in this case, we do not need to decide whether they are prohibited by *Miranda* and its progeny, as any error from the introduction of the confession was harmless. *See, e.g.*, *United States v. Abdulla*, 294 F.3d 830, 837 (7th Cir. 2002) (applying harmless error standard to *Miranda* violation); *Correll v. Thompson*, 63 F.3d 1279, 1291 (4th Cir. 1995) (applying harmless error standard to *Miranda/Edwards* violation); Fed. R. Crim. P. 52(a) ("[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). To be harmless, an error must have no affect on the outcome of the trial. *See Abdulla*, 294 F.3d at 837 ("because he would have been convicted absent the admission of his statements, we affirm."). Here, even excluding Lee's confession, overwhelming evidence supported the jury verdict beyond a reasonable doubt.

The police had been monitoring Lee's apartment, and a confidential informant had purchased drugs from Lee.

When police entered Lee's apartment, they found Lee at a kitchen table surrounded by crack cocaine and drug paraphernalia. In particular, the police recovered loose rocks of crack cocaine on and underneath the table, as well as crack cocaine on a nearby dryer. The police discovered plastic bags, a razor blade, and crack cocaine that had already been packaged for sale. Moreover, the police found Lee's identification card on the table with the crack cocaine.

While this evidence would likely be sufficient by itself to support a conviction, Lee's initial response to the search further supported the outcome at trial. Before questioning began, Lee volunteered to the officers, "She didn't know anything about it. Don't take the kids." The obvious inference from this statement was that Lee feared that his caretaker would lose her children because of her involvement with Lee and his drugs. This statement has the effect of eliminating the caretaker as a possible owner of the drugs, and further implicates Lee as the responsible party. Together, the drug evidence literally surrounding Lee and his pre-interrogation statement supported the outcome in the district court beyond a reasonable doubt.

## B

Lee also challenges his sentence based on *Booker*, asserting that the mandatory nature of the guidelines made his sentence improper. As Lee did not assert this challenge at sentencing, we review for plain error. *See Paladino*, 401 F.3d at 481. While there was no Sixth Amendment violation here, Lee is correct in asserting that one is not necessary. *See United States v. Castillo*, Nos. 02-3584 & 02-4344, 2005 WL 1023029, at *15 (7th Cir. May 3, 2005) (quoting *United States v. White*, No. 03-2875, 2005 WL 1023032, at *7 (7th Cir. May 3, 2005) ("'[M]ere mandatory application of the Guide-

lines—the district court's belief that it was required to impose a Guidelines sentence' . . . constitutes *Booker* error.")). Given that the district court treated the guidelines as mandatory, the defendant is entitled to a limited *Paladino* remand to determine whether the district court, treating the guidelines as advisory, would reimpose the same sentence.

### III

While the methods that the Peoria police employed to convince Lee to waive his *Miranda* rights are a concern, the admission of the confession itself was harmless error. Lee was found surrounded by drugs and made incriminating statements before the interrogation ever started. We will therefore not disturb the conviction. However, we issue a limited remand to the district court on sentencing issues, in accordance with the dictates of *Paladino*.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*